**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**KABEER KHAN**,

     Plaintiff,

v.

**7-ELEVEN, INC.**,

     Defendant.

Civil Action No. 1:14-cv-13384-WGY

**7-ELEVEN'S MEMORANDUM**
**CONCERNING PRELIMINARY INJUNCTIVE RELIEF**

Defendant 7-Eleven, Inc. ("7-Eleven") opposes the Plaintiff's Motion for Preliminary Injunction (Doc. 12) and, in support of its Motion for Preliminary Injunction (Doc. 22), says:

I.    **INTRODUCTION**

7-Eleven terminated Kabeer Khan's franchise agreement because he violated its terms. Mr. Khan's breach was especially egregious. His franchised 7-Eleven® store was involved in a substantial, illegal scheme to accept Electronic Benefit Transfer ("EBT")[1] payments in exchange for cash and prohibited items like cigarettes. Integral to this scheme was the false ringing of store transactions to make it appear that a legitimate EBT sale was occurring so that the register would process and accept an EBT payment.

Mr. Khan does not deny that a fraudulent EBT scheme was ongoing at his store. His excuse is apparently that the scheme's perpetrator was his store manager[2] and that he "did not have any actual or constructive knowledge" of it. (Doc. 14, ¶¶ 5, 6 & 8). The crux of Mr. Khan's position therefore is that he was blind to the rampant EBT fraud occurring at his store.

---

[1] EBT cards are used to distribute public welfare benefits under the Supplemental Nutrition Assistance Program administered by the United States Department of Agriculture Food and Nutrition Services. See, e.g., Rockland Convenience Store v. U.S., No. 1:10cv00260, 2011 WL 5120410, at *1 (D. N.H. Oct. 27, 2011). "'The EBT System is the modern replacement for traditional paper food stamps.'" Id. (quoting Idias v. U.S., 359 F.3d 695, 696 (4th Cir. 2004)).

[2] The store manager is Mr. Khan's brother, Sameer Khan.

1

Mr. Khan's purported ignorance of a massive EBT fraud at his store is not an avoidance of 7-Eleven's termination of the franchise agreement. The franchise agreement requires all transactions to be reported accurately, whether those transactions are being reported by Mr. Khan or one of his employees. Thus, 7-Eleven: (1) properly notified Mr. Khan that he was in breach of his franchise agreement; (2) properly demanded that Mr. Khan fully account to 7-Eleven for the inaccurately-reported sales and related fraud occurring at his Store; and (3) properly terminated the franchise agreement upon Mr. Khan's failure to render an accounting or any other cure of the breaches.

Mr. Khan is utterly incapable of satisfying the burden required for preliminary injunctive relief. As plainly evidenced by Mr. Khan's lack of citation to any legal authority, or even the franchise agreement, Mr. Khan has no privilege to forcibly restore his status as a 7-Eleven® franchisee where the agreement has been validly terminated. On the other hand, the franchise agreement's termination means that Mr. Khan has no license to use the 7-Eleven's business system and trademarks. 7-Eleven is therefore entitled to a preliminary injunction prohibiting Mr. Khan's infringement of 7-Eleven's trademarks in violation of the Lanham Act and also requiring him to honor the franchise agreement's post-termination obligations, including its post-termination covenant not to compete.

## II.  BACKGROUND[3]

- 7-Eleven and Mr. Khan are parties to a Franchise Agreement under which Mr. Khan was permitted to operate a 7-Eleven® store in Fall River, Massachusetts (the "Store").

- In essence, the Franchise Agreement licensed to Mr. Khan the right to use certain trademarks, including 7-Eleven® along with a method of conducting a convenience store business, in exchange for Mr. Khan's promise to pay a percentage of the Store's gross profits to 7-Eleven.

---

[3] The background is a summary of the declarations of Mary Cadigan, Christopher Havis and Christian Spaccaforno that are submitted with this Memorandum.

- In 2013, 7-Eleven received customer complaints concerning illegal (cash for EBT benefits) transactions occurring at the Store and began an investigation.

- 7-Eleven's investigation included a review of the Store's register (also called (Point of Sale ("POS")) data and, from it, 7-Eleven noted an extraordinary number of "non-scanned"[4] sales, "no-sales"[5] and voided transactions, which are indicative of fraudulent activity if used excessively.

- 7-Eleven also obtained security camera recordings from the Store and observed the video corresponding to hundreds of the suspect transactions.

- Upon reviewing the video, 7-Eleven observed an ongoing enterprise of EBT fraud at Mr. Khan's Store.

- In 167 of 214 observed "non-scanned" transactions, the sales associate operating the register would fraudulently record the sale of grocery items (non-scanned sales showing as "grocery non-tax" in register data) in exchange for an EBT payment.

- In dozens of non-scanned, "grocery non-tax" sales transactions, no merchandise was being sold and the sales associate would hand cash to the customer –approximately 50¢ to the dollar – in exchange for the EBT payment.

- In other instances, the sales associate would sell EBT-prohibited items, especially cigarettes, as a non-scanned, "grocery non-tax" item and also ring non-scanned "grocery non-tax" transactions without a customer or merchandise present.

- 7-Eleven identified the sales associate as Sameer Khan, the brother of Mr. Khan and Mr. Khan's appointed manager of the Store.

- 7-Eleven also observed video showing Sameer Khan undertaking 41 transactions involving an EBT card payment that were followed by a "no sale" function; in 28 of these transactions, Sameer Khan was observed to fraudulently process an EBT payment in exchange for cash.

- 7-Eleven also observed Sameer Khan performing 125 "void" transactions, finding that 100% (all 125) involved the inaccurate voiding of sales transactions.

- On August 7, 2014, 7-Eleven provided Mr. Khan with written notice of the breaches of his franchise agreement, describing the fraudulent EBT scheme and attendant inaccurate reporting of sales transactions, and demanding his cure.

---

[4] Non-scanned sales are register transactions culminating in a merchandise sale but for which the underlying products have not have their Universal Product Code ("UPC") scanned at the register, resulting in a register receipt's generic description such as "grocery non-tax".

[5] A no-sale is a register function used to open the cash drawer without a corresponding sale.

- Mr. Khan did not cure within the three day period permitted under the franchise agreement.

- On August 12, 2014, the franchise agreement terminated, and, to be sure, 7-Eleven delivered to Mr. Khan a formal notice of termination, reminding him that he no longer had a license to use 7-Eleven's trademarks and demanding that he vacate the Store's premises, which had been leased to him through the franchise agreement.

- Mr. Khan refused to comply with 7-Eleven's demands and remains in possession of the Store, continuing to operate it as a 7-Eleven® store without permission or license from 7-Eleven to do so.

- Although Mr. Khan claims to have been unaware of the fraudulent activity, 7-Eleven's review of the video and store transaction data has revealed the following:

  ➢ Mr. Khan is observed to be in the Store on 17 of the 32 days that Sameer Khan is seen conducting fraudulent EBT transactions.

  ➢ Mr. Khan is behind the sales counter on at least 5 occasions (1/21/2014, 2/2/2014, 2/7/2017 and 2/8/2014) while Sameer Khan is conducting fraudulent EBT transactions.

  ➢ On 2/7/2014, Sameer Khan is observed giving cash to customers in exchange for fraudulent EBT payments from brown envelopes provided to him by Mr. Khan and kept in a drawer beneath the POS system's cash drawer.

- 7-Eleven has compared the sales reported to it through the POS register and the sales reported through the (pre-integration) EBT terminal,[6] revealing a difference between EBT sales reported to 7-Eleven and requested EBT payments via the dedicated EBT terminal of more than $500,000 for the year 2012, that is, there was approximately $500,000 more in EBT payments to the Store than reported sales using EBT as payment to 7-Eleven.

---

[6] Prior to August of 2013, EBT payments at Mr. Khan's Store were processed through a dedicated EBT terminal separate from the 7-Eleven cash register. This required an EBT sales transaction to be rung both on the register in order to report the sale to 7-Eleven and on the EBT terminal in order to receive payment. The EBT fraud discussed in the text relates primarily to "post-integration" conduct, i.e., after August of 2013, but it is clear from 7-Eleven's review of earlier video and register data that the more recent EBT fraud was merely a continuation of long-standing fraudulent EBT conduct at the Store. The scale of the EBT is fairly estimated by comparing the amount of pre-integration sales reported through the POS system to 7-Eleven to the amount of EBT transaction payments that were occurring per the government, resulting in the $500,000 figure in the text.

## III.     INJUNCTION STANDARD

A party seeking a preliminary injunction under Rule 65 "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011). While all four factors must be weighed, the moving party's likelihood of success on the merits is "the touchstone of the preliminary injunction inquiry." Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998).  The burden of establishing a factual basis to justify a preliminary injunction lies with the party seeking the injunction. Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

## IV.     KHAN IS NOT ENTITLED TO A PRELIMINARY INJUNCTION

### A.     7-Eleven Properly Terminated the Franchise Agreement

Paragraph 26 of the franchise agreement specifies that upon Mr. Khan's "Material Breach," 7-Eleven may notify him of the violation and if he fails to cure within the allowed time, 7-Eleven may then terminate the Franchise Agreement.  A "Material Breach" includes the failure to "properly record, deposit, deliver, or expend and report Receipts … as required by Paragraph 12." (Franchise Agreement, (Doc. 5-1), ¶ 26(a)(4)(b) (p. 28)).[7] Paragraph 12 of the franchise agreement requires Mr. Khan to provide 7-Eleven with "actual sales data" (¶ 12(c)(1)(v)) and this includes his furnishing of daily summaries and reports of "Purchases" and "Receipts" (¶ 12(c)(1)(i) - (ii)).  Mr. Khan also promises in paragraph 12 that "**all information that [he] and [his] employees provide will be truthful, accurate, complete and in compliance with all applicable laws** …."  (Franchise Agreement (Doc. 5-1), ¶ 12 (c)(3)) (emphasis supplied).

In his moving papers, Mr. Khan insists that he was blissfully ignorant of the fraudulent

---

[7] "Receipts" under the franchise agreement is defined as all sales proceeds generated by operation of the Store.  (Franchise Agreement (Doc. 5-1), Ex. "E", p. 7).

EBT scheme at his store. But his affidavit[8] leaves unchallenged the fact of its occurrence and, in particular, that in furtherance of the scheme a great many transactions occurring at his store were inaccurately reported to 7-Eleven. Thus, on August 7, 2014, 7-Eleven properly notified Mr. Khan of the material breach of his franchise agreement. 7-Eleven's notice described the massive EBT fraud ongoing at his store and specified what 7-Eleven knew of its manner, mechanism and scale.[9] 7-Eleven also properly demanded that the identified breaches be cured within three days (see ¶ 26(a)(4)(b)) and noted that the identified cures were designed to restore 7-Eleven to the substantially the same position it would have been in but for the breach (see ¶ 26(b)). As to the inaccurate reporting of transactions, 7-Eleven demanded:

> a) A full, accurate and complete accounting of <u>all</u> fraudulently-reported sales, voids, EBT payments, and other transactions to 7-Eleven from January 1, 2012 to the present day. This includes identification by transaction, merchandise, date and monetary amount collected by you along with any fraudulently-reported sales that were attendant to the transaction. You are warned that that 7-Eleven does not consider any failure by you to have adequate recordkeeping of the frauds committed an excuse for your failure to render the full, accurate and complete accounting to it.

Following the Notice of Material Breach, Mr. Khan made no accounting to 7-Eleven, did not offer any alternative cure and, in fact, undertook none of the other cures required of him by the Notice of Material Breach. After the passage of three business days, therefore, and precisely as warned by the Notice of Material Breach, the franchise agreement automatically terminated. To be sure, 7-Eleven delivered to Mr. Khan a formal Notice of Termination on August 12, 2014.[10]

---

[8] Mr. Khan's Memorandum of Law takes considerably liberty in stretching his purported ignorance of the EBT fraud to a wholesale denial of its occurrence. (e.g., Doc. 13, p. 5 ("The allegations by the Defendant of fraudulent conduct by Kabeer Khan or his employees are vigorously denied in his affidavit …..")). Mr. Khan's affidavit is carefully worded, though. He does <u>not</u> deny that the EBT fraud was occurring, claiming only that he "did not have any actual or constructive knowledge" of it. (Doc. 14, ¶¶ 6-8.)

[9] 7-Eleven's Notice of Material Breach is attached to its Counterclaim as Exhibit "B" (Doc. 5-2).

[10] 7-Eleven's Notice of Termination is attached to its Counterclaim as Exhibit "C" (Doc. 5-3).

In sum, while Mr. Khan's claimed ignorance of the massive EBT fraud ongoing at his Store is, at best, dubious, even if true, it in no fashion cures or even avoids the breach. The franchise agreement is clear – Mr. Khan, as the franchisee, is responsible for the accuracy of information reported to 7-Eleven, whether that information originated directly from him or from one of his employees. Thus, while Mr. Khan is blaming his employee, who is also his brother and appointed store manager, for the inaccurate reporting of sales to 7-Eleven, that is any different from Mr. Khan making the fraudulent reportings to 7-Eleven on his own.

### B.       Mr. Khan's Irrelevant Claim of Pretext

Mr. Khan also claims that 7-Eleven's termination of his franchise agreement was merely to generate additional franchise fees for itself, suggesting that 7-Eleven's grounds for termination were pretextual. To buttress this claim, Mr. Khan makes a hodgepodge of bizarre assertions such as 7-Eleven showed him a "false video recording" to an apparent belief that 7-Eleven is trying to "bribe" the new manager of the Store with EBT fraud. Mr. Khan offers no support at all for these outrageous claims other than his own rank speculation. (Doc. 13, p. 2-3).

As set forth in the Declaration of Christian Spaccaforno, on August 11, 2014, 7-Eleven showed Mr. Khan a single video clip – one of hundreds  – at his request.. This 2 minute and 57 second video is of Mr. Khan's brother, Sameer Khan, processing fraudulent EBT for cash and also EBT for cigarettes transactions at the Store and reporting those transactions inaccurately to 7-Eleven so that an EBT payment would be accepted. Mr. Khan's singular criticism of this video is that it was taken on days that there was purportedly no camera recording at the Store, contending that the video was taken on either "1-10-13 or 10-1-13." (Doc. 13, p. 2). The video was actually recorded on November 10, 2013, as specifically told to Mr. Khan's lawyer via letter from 7-Eleven's counsel on August 12, 2014 (a copy of the pertinent page of this letter is attached to Mr. Khan's Affidavit (Doc. 14)). This letter includes a narrative of the video, its recording date, and also the relevant register receipts[11]:

---

[11]    The receipts, as explained in the Declaration of Christopher Havis, are reproductions (because 7-Eleven did not perpetrate the fraud, it would not have access to the actual register receipts). While

- The receipts for the transactions shown on the video which is from November 10, 2013 (sale #1, sale #2 and a "no sale" to open the cash drawer) are below. In these transaction, Sameer Khan rings up a total of $130.86 in non-scanned "Grocery-Non Tax" merchandise with no merchandise actually being present and receives a total of $130.86 in EBT payments. He gives the customer a pack of cigarettes and then opens the cash drawer using the "no sale" function from which he removes three twenty dollar bills and hands them to the customer.



7-Eleven can hardly imagine a graver problem with a franchise relationship than the fraudulent reporting of sales transactions in order to facilitate an ongoing criminal enterprise at a store bearing the 7-Eleven® brand. But Mr. Khan has apparently deluded himself into believing that the illegal and blatantly fraudulent activities at his Store are not a serious offenses, and that 7-Eleven is seeking to serve some ulterior, untoward purpose by the termination. Reality and common sense, of course, dictate otherwise. 7-Eleven is the premiere franchisor of convenience stores in the world. This success derives not from a scheme of termination and collection of franchise fees but from a proprietary system of store operations that yields successful and consistently profitable convenience stores. Of course, 7-Eleven has tremendously more to gain from the long-term success of an honest and compliant franchisee than from investigation, termination, and litigation-all of which require substantial resources and reduce, if not eliminate, the short-term gain from a single franchisee fee.

---

perhaps appearing slightly different from a receipt generated at the Store, these reproductions are not materially different from those available in the Store.

Furthermore, even if some ulterior motive existed, it would be irrelevant.  In <u>McDonald's Corp. v.</u> <u>Robertson</u>, 147 F. 3d 1301, a franchisor terminated a franchise agreement because of the franchisee's violation of food safety regulations. Through an affidavit, the franchisee described the alleged violations as "not that important' and really just "an excuse" to terminate because the franchisor wanted to "make more money by moving the [franchisee's] McDonald's to another location." <u>Id.</u> at 1309.  The Eleventh Circuit was unimpressed:

> Even assuming, arguendo, that this allegation is correct, however, we find that the [] failure to comply with McDonald's QSC and food safety standards constituted a material breach of the franchise agreement sufficient to justify termination, and thus, it does not matter whether McDonald's also possessed an ulterior, improper motive for terminating the [] franchise agreement.

<u>Id.</u> (citations omitted). Although 7-Eleven denies Mr. Khan's inflammatory accusation of pretext, his claim of improper motivation is irrelevant. The correct inquiry is whether 7-Eleven properly terminated the franchise agreement, and clearly it did.

### C.   *Mr. Khan Cannot Succeed on the Facts or Law*

Mr. Khan's complaint contains five counts: breach of express contract, tortious interference, constructive termination, breach of good faith and fair dealing, and violation of Mass. Gen. Laws ch. 93A.  His Motion for Preliminary Injunction makes no attempt whatsoever to tie the relief requested by it to any of these legally insupportable claims.

Mr. Khan cannot succeed on a claim for breach of contract (Count I) if he cannot identify a provision of the contract that has been breached.  Thus, while 7-Eleven denies any suggestion that Mr. Khan has been treated "unfairly" (Complaint, ¶ 24), there is no specific provision in the Franchise Agreement providing for generic "fairness" as he appears to claim.  <u>See</u> <u>Michelson v.</u> <u>Digital Fin. Servs.</u>, 167 F.3d 715 (1st Cir. 1999) (elements of breach of contract under Massachusetts law[12] include (1) a binding contract; (2) breach of a specific provision of the contract; and (3) damages).  Mr. Khan's other allegations of breach of express contract are that

---

[12]Massachusetts law governs the Franchise Agreement.  <u>See</u> Franchise Agreement, ¶30(a).

7-Eleven violated the parties' contract by issuing "notices of material breach for an alleged fraudulent EBT scheme in which [sic] it provided no evidence" and that 7-Eleven's notices were "unsubstantiated and unsupported." (Complaint, ¶¶ 26, 27). 7-Eleven also rejects these characterizations, but it remains that these claimed breaches suffer from the same defect—there are no provisions proscribing this conduct in the parties' Franchise Agreement. See id.

Mr. Khan also cannot succeed on a claim for intentional interference with contract (Count II). He contends that 7-Eleven's discontinuance of financing interfered with his ability to pay vendors and employees. (Complaint, ¶29.) But 7-Eleven's decision to discontinue financing was well-grounded to prevent further harm to its economic interests from Mr. Khan's EBT fraud. See Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B., 62 Mass.App.Ct. 34 (2004) ("legitimate advancement of [party's] own economic interest. . . is not `improper' for purposes of a tortious interference claim"). Furthermore, 7-Eleven is permitted to discontinue financing if Mr. Khan is in breach of the Franchise Agreement, which he clearly is, or 7-Eleven reasonably perceives its security interest is threatened. See Franchise Agreement, ¶ 13(b).

Mr. Khan entitles Count III "Constructive Termination." It is really just a restatement of his other claims under the label "Constructive Termination," and, as already discussed, 7-Eleven can hardly be faulted for taking actions specifically permitted by the Franchise Agreement, particularly in light of Mr. Khan's POS and EBT fraud. Also, there is no stand-alone claim for "Constructive Termination" recognized under Massachusetts law. Where constructive termination claims have been validly made, they have been tied to the protection or vindication of statutory rights. See Remco Distributors, Inc. v. Oreck Corp., 814 F.2d 171, 174-75 (D. Mass. 1992) (noting in the context of a vacuum distributor's dispute with a manufacturer that "[w]hile Massachusetts courts have recognized constructive termination claims, such recognition has occurred in cases involving statutes that are not at issue in this case.").

Mr. Khan also sues for "Violation of the Covenant of Good Faith and Fair Dealing" (Count IV). He does not, however, address any specific conduct that he contends violates the implied covenant, and instead incorporates by reference all of the prior allegations of his complaint, leaving one to guess his precise grounds. Even so, 7-Eleven presumes that this claim is predicated on Mr. Khan's incorrect belief that 7-Eleven's actions are somehow "unfair." Under Massachusetts law, "the implied covenant … may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004). Therefore, the implied covenant cannot be used in the manner that Mr. Khan seeks—to create a new duty for 7-Eleven under the Franchise Agreement.

Lastly, Mr. Khan sues for a violation of Mass. Gen. Laws ch. 93A (Count IV), regurgitating the same basic allegations that form the grounds of his prior counts. "The standard for behavior that falls within the ch. 93A proscription is notably imprecise, encompassing any actions that 'attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce, have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness.'" St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis, 262 F.3d 53, 66 (1st Cir. 2001) (internal citations omitted). Notwithstanding the lack of precision, it is clear that unsuccessful common law claims, like Mr. Khan's preceding Counts, cannot be repurposed as a viable claim for violation of ch. 93A § 11 merely by attaching the label "unfair and deceptive" to the complained-of conduct. See FAMM Steel v. Sovereign Bank, 571 F. 3d 93, 107-108 (1st Cir. 2009) ("Because these underlying claims fail, it is clear that plaintiffs have not shown the conduct complained of fell within any common-law, statutory or other established

concept of unfairness; thus summary judgment was properly granted as to the chapter 93A claim.").

For the foregoing reasons, Mr. Khan is unlikely to succeed on the merits and he is not entitled to interim injunctive relief.

### D. Mr. Khan Cannot Establish Irreparable Harm

The First Circuit has explained that "'[i]rreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Community Health Center, Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir., 2005) (citations omitted); Ross-Simons of Warwick v. Baccarat, Inc. 217 F.3d 8, 13 (1st Cir. 2000) ("It is settled beyond peradventure that irreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'") (quotation and citation omitted).  In this case, Mr. Khan will be utterly unable to demonstrate irreparable harm, because his claims are not cognizable under existing law in the first instance, as discussed in the preceding section.  See Bear Republic Brewing Co. v. Central City Brewing Co., 716 F. Supp. 2d 134, 152 (D. Mass. 2010) (inability of infringement plaintiff to establish likelihood of success precludes finding of irreparable harm).

### E. Balance of Hardships Favors 7-Eleven

If successful in his request for an injunction, Mr. Khan would force 7-Eleven to treat him like a franchisee in good standing, even though he is clearly not.  He would use premises and equipment belonging to 7-Eleven without its permission. He would use the credit available through the Open Account to purchase goods and inventory for the store, without adequate assurance of repayment of either past or future obligations. These hardships proposed to be visited upon 7-Eleven by Mr. Khan greatly outweigh any hardship to him.

Moreover, no judicial system can reward legal advances found on deception.  Put another way, in seeking equitable relief, Mr. Khan must himself do equity.  See Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands.");  K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 910-12 (1st Cir. 1989) (discussing "venerable maxim" that "he who seeks equity must do equity").  The genesis of the dispute at hand, and its ultimate resolution, is the deceit concerning EBT transactions at his store.  In sum and substance, the transactions reported from the Store represented to 7-Eleven that legitimate EBT sales were occurring when in fact there was a massive criminal enterprise of trading cash and cigarettes for EBT payments.  This conduct alone is grounds to deny him the injunction he seeks.

### F.    An Injunction Is Against the Public Interest

Mr. Khan cannot demonstrate that the injunction he seeks benefits the public interest.  To the contrary, it is a considerable public interest that consumers be free of confusion concerning the source and sponsorship of goods and services.  Here, Mr. Khan seeks by an injunction to perpetuate a fraud on the public – to represent himself as an authorized 7-Eleven franchisee, when he is not.  Furthermore, an injunction would allow Mr. Khan to openly flout and disregard the terms of his franchise agreement, which plainly require the accurate reporting of store transactions to 7-Eleven. "It is in society's best interest to recognize and enforce agreements which were voluntarily entered-into and accepted.  Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged."  Shipley Co., LLC v. Kozlowski, 926 F. Supp. 28, 30 (D. Mass. 1996).

### G.    Injunction Bond

Although 7-Eleven maintains that Mr. Khan is not entitled to any injunctive relief, it would be remiss not to mention the requirement of security should an injunction nevertheless be

issued. Rule 65(c), of course, mandates security to protect an enjoined party in the event a preliminary injunction is later found to have been wrongful. As explained by Justice Stevens:

> Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully. The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction.

Edgar v. Mite Corporaiton, 457 U.S. 624, 649 (1981) (Stevens, J., concurring in part and concurring in the judgment) (footnote omitted); see also Northeast Airlines, Inc. v. Nationwide Charters & Conventions, Inc., 413 F.2d 335, 338 (1st Cir. 1969) (explaining that a security issued under Rule 65(c) protects against damages "suffered by reason of the [wrongfulness] of [a] preliminary injunction").

In the declarations filed with this opposition, 7-Eleven demonstrates hundreds of thousands of dollars in financial harm that would result from being forced to treat Mr. Khan as if he were a franchisee in good standing. That risk is essentially unlimited because of the open account financing arrangement that 7-Eleven maintains with franchisees in (actual) good standing. If enjoined in the manner suggested by Mr. Khan, 7-Eleven, therefore, suggests security in an amount no less than $500,000.

## VI.    7-ELEVEN IS ENTITLED TO INJUNCTIVE RELIEF

### A.    Trademark Infringement

#### 1)    Substantial Likelihood of Success on the Merits

To prove trademark infringement under the Lanham Act, a plaintiff "must show that it owns the mark in question, that the defendant's mark is similar to or the same as the plaintiff's mark, and that defendant's use of the mark is likely to cause confusion among consumers." Dunkin' Donuts, Inc. v. Gav-Stra Donuts, Inc., 139 F. Supp. 2d 147, 158 (D. Mass. 2001) (citing I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 43 (1st Cir. 1998)).

The critical issue in most Lanham Act cases is the likelihood of consumer confusion. Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 28 (1st Cir. 1989). Notably, "[t]he continued use of a trademark after breach of a franchise agreement is alone dispositive of the infringement action." Dunkin' Donuts, 139 F. Supp. 2d at 158; see also Curves Int'l, Inc. v. Fox, No. 12-12250-RGS, 2013 WL 1946826, at *2 (D. Mass. May 9, 2013) ("It is unnecessary to wade individually through the . . . factors informing a 'likelihood of confusion' anlaysis here, where a franchisee has persisted in unauthorized use of her former franchisor's trademark to operate a business identical to that of her formerly licensed franchise."); S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 375 (3d Cir. 1992) ("Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act."); Dunkin' Donuts Franchised Rests., LLC v. ABM Donuts, Inc., No. CA-11-270S, 2011 WL 6026129, at *5 (D.R.I. Oct. 4, 2011) (holding that franchisees' "continued use of the exact same marks as when they were licensed franchisees makes the likelihood of confusion inevitable").

Despite losing authorization to use 7-Eleven's trademarks, Mr. Khan continues to operate a convenience store bearing 7-Eleven's marks and offering for sale many of the same products as those offered while Franchisee operated the same location as a licensed 7-Eleven store. It undoubtedly follows that Franchisee's continued use of 7-Eleven's marks after termination of the Franchise Agreement constitutes infringement and causes consumer confusion in violation of the Lanham Act. Thus, 7-Eleven has a substantial likelihood of success on its Lanham Act claims.

### 2) Irreparable Harm

The overwhelming likelihood of consumer confusion establishes 7-Eleven's irreparable injury and entitlement to an injunction. Curves, 2013 WL 1946826, at *2 ("Because [franchisor] has demonstrated that it is likely to succeed in establishing trademark infringement, it is presumed that [franchisee's] operation of a rogue Curves fitness facility will cause irreparable harm to [franchisor] unless injunctive relief is granted.")

Even absent such a presumption, Mr. Khan's trademark infringement irreparably harms 7-Eleven's goodwill and business reputation because 7-Eleven cannot control the quality of Franchisee's goods and services. Such loss of control necessarily causes irreparable harm. See Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 700 (1st Cir. 1987) ("Few harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it. The threat of substantial damage to [plaintiff's] hard-won business and reputation made out a sufficient showing of irreparable harm to warrant immediate redress.").

### 3) The Balance of Harm Weighs in Favor of 7-Eleven

"When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." Krause Int'l, Inc. v. Reed Elsevier, Inc., 866 F. Supp. 585, 587-88 (D.D.C. 1994); see also Commerce Bank & Trust Co. v. TD Banknorth, Inc., 554 F. Supp. 2d 77 (D. Mass. 2008) ("In weighing the balance of harms resulting from . . . a preliminary injunction in a trademark infringement case, it is generally true that the 'harm to the defendant flowing from an injunction where infringement appears likely is entitled to less consideration than other harms.'" (quoting Fritz v. Arthur D. Little, Inc., 944 F. Supp. 95, 97-98 (D. Mass. 1996))).

### 4) A Preliminary Injunction Advances Public Interest

"In trademark cases, the public interest almost always favors the granting of otherwise 'appropriate injunctions.'" Commerce Bank, 554 F. Supp 2d at 77. Here, 7-Eleven has demonstrated an overwhelming likelihood of customer confusion, and that showing suffices to "'place the weight of public interest concerns in favor of granting the injunction.'" Id.

### B. Restrictive Covenants

The Franchise Agreement contains a narrow restrictive covenant prohibiting Franchisee from maintain[ing], operat[ing], engag[ing] in, or hav[ing] any financial or beneficial interest in,

advis[ing], assist[ing], mak[ing] loans to, or leas[ing] to, a Competitive Business" located at the Store or at the site of any former 7-Eleven store within two years of it being operated as a 7-Eleven store for one year after termination.  (See Franchise Agreement, ¶ 5(d)).

### 1)    Substantial Likelihood of Success on the Merits

In Massachusetts, a covenant not to compete is valid if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest.  See Boulanger v. Dunkin' Donuts Inc., 915 N.E.2d 572, 576 (Mass. 2004); Curves, 2013 WL 1946826, at *2 ("As the non-compete agreement is necessary to protect Curves' business of selling fitness franchises, it is enforceable.").  Generally, restrictive covenants arise in either the employment context or the sale of a business.  Boulanger, 915 N.E.2d at 576.  Restrictive covenants contained in a franchise agreement are more akin to the latter, which, from a practical perspective, means that courts look "less critically" at such covenants because they do not implicate an individual's right to employment.  Id.

Massachusetts law recognizes that legitimate business interests include protection of confidential information, such as operating manuals, recipes, financial information and data, and marketing and promotion strategy.  Id.  This is precisely the type of information 7-Eleven seeks to enforce through the Franchise Agreement's restrictive covenant.

Additionally, the Supreme Judicial Court of Massachusetts has held that a two-year limit in a covenant not to compete is reasonable.  Boulanger, 815 N.E.2d at 643.  Here, the covenant 7-Eleven seeks to enforce involves only a one-year restriction.  See Complaint, Ex. A, ¶5(d).  Likewise, the Supreme Judicial Court upheld the geographic scope of a covenant that proscribed competitive conduct in a five-mile radius of any of the franchisor's restaurants.  Boulanger, 815 N.E.2d at 643.  In contrast, the 7-Eleven restrictive covenant restricts competition only at the site of Store or at the site of any former 7-Eleven store within two years of it being a 7-Eleven store.

Accordingly, 7-Eleven will likely succeed in its claims to enforce the restrictive covenants of the Franchise Agreement. See id. (enforcing covenant not to compete and reasoning "[t]he [franchise] system is reasonable because it binds all other franchisees and is part of what the defendant sells. The system is part of what the plaintiff, as a franchisee, purchased and what protected him while he was a franchise owner."); see also In re Ward, 194 B.R. 703, 711-12 (Bankr. D. Mass. 1996) ("Courts . . . readily grant an injunction for breach of a covenant not to compete. Indeed, the injured party invariably requests injunctive relief because an injunction gives strong assurance he will receive precisely what was bargained for.")

### 2) Irreparable Harm

Mr. Khan's violation of the restrictive covenants will cause 7-Eleven to suffer irreparable harm. Oxford Global Res., Inc. v. Guerriero, No. Civ. A. 03-12078-DPW, 2003 WL 23112398, at * (D. Mass. Dec. 30, 2003) ("Massachusetts courts have generally recognized, in the context of restrictive covenants, that the 'task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one.'" (quoting Kroeger v. Stop & Shop Co., 432 N.E.2d 566, 573 (1982) (finding harm to goodwill of technology placement firm would be irreparable))); see also I Can't Believe It's Yogurt v. Gunn, No. Civ. A. 94-OK-2109-TL, 1997 WL 599391 (D. Col. April 15, 1997) (finding irreparable harm where franchisee breached covenant not to compete).

Franchisee's behavior further warrants a finding of irreparable harm. Franchisee received training and confidential information belonging to 7-Eleven and, for a number of years, used that confidential information to establish a successful business. Now, in defiance of his unmistakable obligation not to compete, Franchisee is misappropriating 7-Eleven's confidential information and pirating and trading on the goodwill associated with -Eleven. If Franchisee is not enjoined, 7-Eleven cannot effectively protect its marks in Franchisee's territory, loses locational goodwill, cannot prevent lost sales and lost goodwill, and cannot protect the integrity of its entire franchise

system for the benefit of franchisees who comply with their contractual obligations. See Curves, 2013 WL 1946826, at *2 (finding irreparable harm because franchisor could not "protect its other franchisees from the actions of [defendant] while she holds herself out to be a legitimate . . . franchisee"). As a result, the Court should find that 7-Eleven has shown irreparable harm arising from Franchisee's flagrant violations of his covenants not to compete.

### 3) The Balance of Harm Weighs in Favor of 7-Eleven

The harm, if any, suffered by Mr. Khan as a result of a preliminary injunction is self-inflicted. Franchisee entered the franchise relationship and enjoyed the benefit of the franchise for nearly a decade. Franchisee cannot now on a whim disregard his restrictive covenants, deprive 7-Eleven of the benefit of its bargain, and unfairly interfere with the preservation of 7-Eleven's customer relationships and goodwill. See Curves, 2013 WL 1946826, at *2 (finding injunction would merely require franchisee to comply with her contractual obligations); see also I Can't Believe It's Yogurt, 1997 WL 599391, at *20 ("Courts are generally unsympathetic to franchisees who blatantly disregard covenants not to compete.").

### 4) A Preliminary Injunction Advances the Public Interest

The injunctive relief sought by 7-Eleven serves the public interest because enforcement of a valid restrictive covenant encourages parties to adhere to their contractual obligations. See Boulanger, 815 N.E.2d at 581-82 (noting that enforcement of restrictive covenants in the franchise context comports with public policy); Bio-Imaging Techs., Inc. v. Marchant, 584 F. Supp. 2d 322, 330 (D. Mass. 2008) ("Here the injunction serves the public interest in enforcing contractual arrangements.").

## CONCLUSION

For the reasons set forth above, 7-Eleven respectfully requests that the Court deny Mr. Khan's Motion for Preliminary Injunction and grant 7-Eleven's Motion for Preliminary Injunction.

Dated: September 19, 2014

Respectfully submitted,

7-ELEVEN, INC.,
By its attorneys,

s/Christian C. Burden
Steven M. Cowley (BBO #554534)
Carolyn A. Alenci    (BBO# 675744)
DUANE MORRIS, LLP
100 High Street, Suite 2400
Boston, MA  02110
Tel:  1-857-488-4200
Fax:  1-847-488-4201
smcowley@duanemorris.com
caalenci@duanemorris.com

Christian C. Burden (Pro Hac Vice)
Quarles & Brady LLP
101 E. Kennedy Blvd., Ste. 3400
Tampa, Florida 33602
Tel: (813) 387-0265
chris.burden@quarles.com

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 19, 2014.

Additionally, a copy of the foregoing was sent by email and U.S. Mail to:

John P. Francoeur
Levin & Levin
138 Rock Street
Fall River, MA  02722
(jpf@levin4law.com)

s/Christian C. Burden

Christian C. Burden
